# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| KIM PETERSON, | ) |
| | ) |
| **Plaintiff,** | ) |
| v. | )     **Case No. 09-2659-JAR** |
| | ) |
| | ) |
| GARMIN INTERNATIONAL, INC., | ) |
| | ) |
| **Defendant.** | ) |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) |

## MEMORANDUM AND ORDER

This case comes before the Court on Defendant's Motion for Summary Judgment (Doc. 41) on plaintiff's Complaint, alleging violations of the Family Medical Leave Act[1] ("FMLA"), and the Americans with Disabilities Act[2] ("ADA"). Plaintiff previously voluntarily dismissed her claim under the Age Discrimination in Employment Act.[3] Plaintiff has responded and moves for leave to file a surreply (Doc. 50). Because there are material issues of fact surrounding defendant's termination of plaintiff days before the commencement of her previously approved FMLA leave, the Court denies summary judgment on the FMLA claims of interference and retaliation. However, because there is no material issue of fact supporting a determination that plaintiff was disabled within the meaning of the ADA, the Court grants summary judgment on the ADA claim.

## I.     Summary Judgment Standard

---

[1] 29 U.S.C. §2611 *et seq.*

[2] 42 U.S.C. §12101 *et. seq.*

[3] Doc. 20.

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law."[4] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[5] "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[6] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[7] An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[8]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[9] In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[10]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to

---

[4]Fed. R. Civ. P. 56(a).

[5]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[6]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[7]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998)).

[8]*Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

[9]*Spaulding v. United Transp. Union,* 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986)).

[10]*Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler,* 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

"set forth specific facts showing that there is a genuine issue for trial."[11]  The nonmoving party

may not simply rest upon its pleadings to satisfy its burden.[12]  Rather, the nonmoving party must

"set forth specific facts that would be admissible in evidence in the event of trial from which a

rational trier of fact could find for the nonmovant."[13]

Summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an

important procedure "designed to secure the just, speedy and inexpensive determination of every

action."[14]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of

facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope

that something will turn up at trial."[15]  When examining the underlying facts of the case, the

Court is cognizant that it may not make credibility determinations or weigh the evidence.[16]

## II.    Evidentiary Issues

There are clear and firm rules and requirements for what testimony and documents are

properly before the Court for consideration.[17]  Defendant challenges many of plaintiff's

assertions of controverted facts, as well as plaintiff's additional statements of fact on the basis

that they rely upon inadmissible hearsay or  unauthenticated documents, rely upon matters that

---

[11]*Anderson,* 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

[12]*Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

[13]*Mitchell v. City of Moore, Okla.,* 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler,* 144 F.3d at 671); *see Kannady,* 590 F.3d at 1169.

[14]*Celotex,* 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[15]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

[16]*Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

[17]*Id.*

are not within plaintiff's personal knowledge, or rely upon plaintiff's affidavit that alleges new or inconsistent facts in a manner rendering the affidavit a sham.

At the outset, the Court notes that its determination of what constitutes the factual record in this case has been a laborious and difficult process, largely because plaintiff has failed to abide by Fed. R. Civ. P. 56, and the local rule governing summary judgments, D. Kan. Rule 56. Plaintiff fails to support many of her statements of fact with reference to exhibit numbers in the summary judgment record. Instead, plaintiff references documents by their deposition number, without even identifying to whose deposition such exhibit was attached, and without using the exhibit numbering sequence plaintiff employed in its filings in this case.[18] It is not the Court's obligation or responsibility to cull through the record, looking for documents that are cryptically and inaccurately referenced to in a party's submission. It is the parties' obligation and responsibility to cite to the record specifically and with particularity. Rule 56(c) mandates procedures for supporting factual assertions or supporting an assertion that a fact is genuinely disputed:

> **(1) Supporting Factual Positions.** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials.[19]

And this Court's Local Rule 56.1(b)(1) requires that one opposing a motion for summary

---

[18] For example, plaintiff refers to "Depos. exh. 74" in her Statement of Fact 79. After a frustrating search, the Court ascertained that this document was also numbered Exhibit AA, as well as Attachment 14 to plaintiff's response memorandum. Moreover, plaintiff sometimes refers to exhibits by defendant's numbering convention, adding chaos to confusion.

[19] Fed. R. Civ. P. 56(c).

judgment identify in numbered paragraphs each fact in dispute, referring "with particularity those portions of the record upon which the opposing party relies."[20]  Although some of the documents plaintiff inaccurately references are otherwise in the record through the defendant's submissions, this Court declines to spend umpteenth hours culling through the record to see if certain deposition exhibits referenced by plaintiff are even in this record.  As this Court has explained to counsel in the past, the Tenth Circuit has held that merely placing evidence in the record on summary judgment without pointing the Court to it is insufficient; instead, "it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without . . . depending on the trial court to conduct its own search of the record."[21]  This Court declines to conduct a fishing expedition of plaintiff's affidavit or any other record evidence in order to support the assertions made in her response.  Thus, in accordance with Local Rule 56.1, the Court will deem admitted for the purpose of summary judgment all facts that are not controverted by a readily identifiable portion of the record.

Plaintiff further failed to abide by the federal and local rules governing summary judgment motions, by citing to documents that were inadmissible for lack of authentication or because they were hearsay documents offered for truth of the matter asserted.  A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.[22]  Defendant raised a number of objections on this basis.

Local Rule 56 requires that,

---

[20]D. Kan. Rule 56.1(b)(1).

[21]*Cross v. Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) (quoting *Downes v. Beach*, 587 F.2d 469, 472 (10th Cir. 1978)).

[22]Fed. R. Civ. Proc. 56(c)(2).

**(d) Presentation of Factual Material.** All facts on which a
motion or opposition is based must be presented by affidavit,
declaration under penalty of perjury, and/or relevant portions of
pleadings, depositions, answers to interrogatories, and responses to
requests for admissions. Affidavits or declarations must be made on
personal knowledge and by a person competent to testify to the
facts
stated that are admissible in evidence. Where facts referred to in an
affidavit or declaration are contained in another document, such as
a
deposition, interrogatory answer, or admission, a copy of the
relevant excerpt from the document must be attached.[23]

When deciding a summary judgment motion, the Court may consider evidence

submitted, if admissible in substance, even if it would not be admissible, in form, at the trial.[24]  A

party may properly authenticate a document "through a supporting affidavit or deposition

excerpt from anyone with personal knowledge of the facts contained in the exhibit."[25]  An

exhibit may also qualify as "self-authenticated" under Fed. R. Evid. 902.  The Tenth Circuit has

explained,

> Parties may, for example, submit affidavits in support of summary
> judgment, despite the fact that affidavits are often inadmissible at
> trial as hearsay, on the theory that the evidence may ultimately be
> presented at trial in an admissible form.  Nonetheless, "the content
> or substance of the evidence must be admissible."  Thus, for
> example, at summary judgment courts should disregard
> inadmissible hearsay statements contained in affidavits, as those
> statements could not be presented at trial in any form.  The
> requirement that the substance of the evidence must be admissible
> is not only explicit in Rule 56, which provides that "[s]upporting
> and opposing affidavits shall . . . set forth such facts as would be
> admissible in evidence," Fed. R. Civ. P. 56(e), but also implicit in
> the court's role at the summary judgment stage.  To determine

---

[23]D. Kan. Rule 56.1(d).

[24]*Argo v. Blue Cross Blue Shield*, 452 F.3d 1193, 1199 (10th Cir. 2006).

[25]*Toney v. Cuomo*, 92 F. Supp. 2d 1186, 1196 (D. Kan. 2000), *aff'd*, 221 F.3d 1353 (10th Cir. 2000).

> whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury.[26]

Defendant challenges a number of the documents that plaintiff cites to in support of her factual assertions because the documents are not properly authenticated. The Court agrees. For example, plaintiff cites to a number of doctors' notes, yet does not authenticate these notes through the testimony of the doctor. Nor does plaintiff provide her own affidavit or particular excerpt of her own deposition testimony in which she authenticates these notes as something she received from the doctor. To the extent that plaintiff has failed to authenticate documents, the Court disregards the same. As this Court explained in *Bell v. City of Topeka, Kansas*,[27]

> Unauthenticated documents, once challenged, cannot be considered by a court in determining a summary judgment motion. In order for documents not yet part of the court record to be considered by a court in support of or in opposition to a summary judgment motion they must meet a two-prong test: (1) the document must be attached to and authenticated by an affidavit which conforms to rule 56(e); and (2) the affiant must be a competent witness through whom the document can be received into evidence . . . . Documentary evidence for which a proper foundation has not been laid cannot support a summary judgment motion, even if the documents in question are highly probative of a central and essential issue in the case.[28]

There are some documents in this category that defendant also cited to and that defendant properly authenticated. The Court does consider those documents, since they were properly authenticated, albeit by defendant.

---

[26]*Argo v. Blue Cross Blue Shield*, 452 F.3d 1193, 1199 (10th Cir. 2006) (quoting *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995); Fed. R. Civ. P. 56(e)) (citations omitted).

[27]496 F. Supp. 2d 1182 (D. Kan. 2007).

[28]*Id.* at 1184-85 n.11 (D. Kan. 2007) (citing *In re Harris*, 209 B.R. 990, 996 (B.A.P. 10th Cir. 1997) (quoting 11 James Wm. Moore, et al., Moore's Federal Practice §§ 56.10[4][c][i], 56.14[2][c] (3d ed. 1997)); *see also Toney v. Cuomo*, 92 F. Supp. 2d at 1196.

Other documents plaintiff cites to are not properly considered by the Court because the documents are substantively hearsay. For example, there are several doctors' notes that defendant properly authenticated and that the Court properly considers as germane to plaintiff's FMLA claims. These are doctors' notes that plaintiff provided to her employer when requesting leave. Yet plaintiff, without authenticating these same notes through the affidavit or deposition testimony of the authoring doctor, cites to the notes for the truth of the matter asserted by the doctors in the notes. The Court disregards the substance of the notes as inadmissible hearsay in these instances. One such example is a doctor's note, which is properly before the Court, as defendant properly cited to and authenticated the note, offered to show that this note was given by plaintiff to her employer. But, the note is not properly before the Court for the purpose plaintiff seeks, a purpose germane to plaintiff's ADA claim, which is that the doctor stated, and that it is thus true, that plaintiff had fecal incontinence issues of a certain severity as of that time.

With respect to testimonial evidence, the court may consider affidavits in support of summary judgment, despite the fact that affidavits are inadmissible at trial as hearsay, on the theory that the evidence may ultimately be presented at trial in an admissible form.[29] To the extent the content of plaintiff's statement of facts is properly supported by sworn deposition testimony or sworn statements in the form of affidavits, such statements are admissible to the extent the content of the statement is based on personal knowledge and it not otherwise hearsay. Under Rule 56, "[a]n ffidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence and show that the affiant

---

[29] Fed. R. Civ. P. 56(e).

or declarant is competent to testify on the matters stated."[30]  Furthermore, a witness's testimony is only admissible if evidence supports a finding that the witness has personal knowledge of a matter.[31]  And, to the extent the content of any such statement is obviously not substantively within the personal knowledge or perception of the witness, the Court disregards the same, as statements of mere belief in an affidavit or deposition testimony must be disregarded.[32]

Defendant also objects to some of the averments in plaintiff's affidavit attached to her memorandum in response to the summary judgment motion.  Defendant claims that certain statements are inconsistent with plaintiff's testimony, or raised for the first time, in a manner that renders her affidavit a "sham."  While a court should not automatically reject a declaration because it conflicts with prior sworn statements,[33] such evidence may be disregarded when a court concludes that the evidence is merely an attempt to create a sham fact issue.[34]  In determining whether a plaintiff's declaration presents a sham fact issue, the court considers:

> whether the [party] was cross-examined during his earlier testimony, whether the [party] had access to pertinent evidence at the time of his earlier testimony, or whether the [contested evidence] was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the [contested evidence] attempts to explain.[35]

In this case, the Court has carefully reviewed plaintiff's prior deposition testimony and finds that

---

[30]Fed. R. Civ. P. 56(c)(4); D. Kan. Rule 56.1(d).

[31]Fed. R. Evid. 602.

[32]*Id.*

[33]*Martinez v. Barnhart*, 177 F. App'x 796, 800 (10th Cir.2006).

[34]*See Coleman v. Blue Cross Blue Shield of Kan.*, 487 F. Supp. 2d 1225, 1237-38 (D. Kan. 2007) (citing *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir.1986)).

[35]*Id.* (quoting *Franks*, 796 F.2d at 1237).

defendant's complaints about plaintiff's affidavit are largely unmerited.[36]

In short, the Court disregards documents that are not cited to with particularity nor cited to in a manner in which the Court can readily find them in the record. The Court disregards documents that are not properly authenticated, or the content of documents that are hearsay, to the extent they are offered for truth of the matter asserted. The Court disregards any statements in plaintiff's affidavit that meet the test of a "sham" affidavit. All of these important rules have significance, for Rule 56(e) gives the Court the discretion to consider as uncontroverted, facts that one party asserts are controverted yet fails to support with proper reference to the record.[37]

## III.    Motion to File Surreply

Plaintiff moves for leave to file a surreply on the basis that defendant filed a ninety-seven page reply brief raising new evidence and new arguments, which requires a response from plaintiff.   "[I]f the court relies on new materials or new arguments in a reply brief, it may not forbid the nonmovant from responding to those new materials."[38]   But in her two page motion, plaintiff fails to identify any new evidence or arguments raised in defendant's reply brief, and the Court is unaware of any. Thus, the motion for leave to file surreply is denied.

## IV.    Uncontroverted Facts

With the above rules of law and principles of application in mind, the following facts are

---

[36]For example, defendant contends that plaintiff's statement that she asked her supervisor for a personal leave of absence without pay through October 7, 2008 is a sham. Defendant points to this exchange during plaintiff's deposition: "Q: Did you ever talk to anybody at Garmin following the hernia surgery [in December 2008] regarding Garmin's leave of absence policy? A: I don't know." The Court fails to see how this testimony, which can reasonably be interpreted to be limited to what plaintiff discussed with her employer in connection with an unrelated surgery at an unrelated time, renders her affidavit a sham.

[37]Fed. R. Civ. P. 56(e).

[38]*Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1192 (10th Cir. 2006).

uncontroverted, stipulated to, or viewed in the light most favorable to plaintiff.

Defendant is in the business of developing, manufacturing, and marketing global positioning system products. Defendant hired plaintiff in 2004 as a Raw Material Inspector (RMI). RMIs are responsible for timely inspecting and ensuring the quality of materials received by outside vendors, before defendant stocks or uses these materials. All RMIs, including plaintiff, worked a set schedule Monday through Friday, assigned to either the day shift or night shift. At all relevant times, the RMIs, including plaintiff, were supervised by Tommy Johnson.

### Defendant's attendance policies and practices

At all relevant times, and as stated in the RMI job description, an essential requirement of each RMI was compliance with defendant's Attendance Policy. The Attendance Policy, implemented over ten years ago, is a points-based policy that gives offending employees differing point levels for different types of attendance infractions. No points are assessed for military leave, authorized and approved FMLA leave and workers' compensation absences, and other types of approved "paid-time-off" absences. The Attendance Policy also prescribes the progressive discipline to be issued to employees who have accrued certain numbers of points for unapproved or unauthorized absences. The discipline ranges from Verbal Counseling upon accrual of four points, to Notice of Written Review upon accrual of five points, to Notice of Final Warning upon accrual of six points, to Termination upon accrual of seven points. Employees have the opportunity to eliminate one point for each period of thirty consecutive days in which they have no attendance occurrence. Supervisors are generally responsible for correctly "inputting" an employee's absence in defendant's attendance tracking system and ensuring that

the employee is appropriately assessed attendance points. Defendant's Human Resources Department ("HR") runs and reviews an attendance report every Tuesday, identifying which employees have accrued points in the preceding week and what level of progressive discipline is prescribed. The supervisor would then administer the progressive discipline, and would have available to the employee their complete attendance and discipline records, for review.

At all relevant times, defendant also had a well-established "Schedule Deviation" policy that allowed employees to modify their set shift schedule without accruing an attendance point under the Attendance Policy. Supervisors could approve an employee requested shift or schedule deviation if the request met each of four conditions: (1) the schedule modification was for no more than four hours; (2) the request was made at least one day in advance; (3) the employee made up all missed time in the same work week; and (4) the employee needed the schedule modification to attend a medical, dental, or court appointment.

Prior to May 2008, while defendant terminated employees who accrued seven attendance points, the Attendance Policy gave defendant the discretion to terminate employees who received three Notices of Final Warning within a twelve month period. Prior to April 18, 2008, the relevant attendance policy for operations employees such as plaintiff read, "[t]hree written warnings within a 12 month period may constitute grounds for termination." On April 18, 2008, the attendance policy for operations employees was merged with the attendance policy for call center employees, and the Attendance Policy, which applied to all employees, including plaintiff, read that in addition to the table of progressive discipline based on accumulation of points, "[t]hree written warnings within a 12 month period may also constitute grounds for termination."

***Plaintiff's history of attendance points, progressive discipline and FMLA leave***

During her entire first three years of employment, from May 2004 to December 2007, plaintiff received eight Notices of Verbal Counseling, five Notices of Written Review and three Notices of Final Written Review. During this period, plaintiff never challenged the assessment of any attendance points during all times relevant to this action. During the twelve months preceding October 7, 2008, plaintiff received two Notices of Final Warning, on March 12 and May 9, 2008.

Throughout her employment, plaintiff requested and received protected leave under defendant's FMLA policy. During all times relevant to this action, plaintiff was never assessed an attendance point for an absence caused by an FMLA eligible event when she had FMLA leave available. In the year before her October 2008 termination, plaintiff was absent on approved FMLA leave at various times in October, November, and December 2007, and January 2008. By January 22, 2008, plaintiff had exhausted her available FMLA leave, and was not eligible to take FMLA leave again until October 8, 2008.[39]

### *Plaintiff's medical problems*

In November 2007, plaintiff sustained an injury to her left rotator cuff, causing pain and limitation in movement. Plaintiff took FMLA leave because of this condition. Plaintiff scheduled surgery on her shoulder for October 8, 2008, the first date for which she was eligible to take FMLA leave again. Her surgery was inexplicably delayed to October 21, 2008. From November 2007 through her period of post-surgery recovery, plaintiff's doctor restricted her from lifting more than ten pounds during three periods, totaling about six months over a span of

---

[39] The Court disregards plaintiff's claim that she believed she had remaining FMLA leave on January 23, 2008. Plaintiff did not include this claim in her EEOC complaint; nor did she testify to this when asked about whether she had been improvidently assessed points while on eligible FMLA leave. This new statement of plaintiff's belief is also unsupported by any evidence.

one year: from November 21, 2007 to February 7, 2008; April 10 to May 10, 2008, and September 9 to November 20, 2008.  Four weeks post-surgery, plaintiff had no lifting or pulling restrictions of any kind and her doctor fully released her to work.

From approximately February 2008 to March 2009, plaintiff  had a problem with her bowel, causing  fecal incontinence or the frequent urge to have bowel movements.  The condition was intermittent; plaintiff testified that it would "come and go." Although she needed to have a parking space close to the building for some period of time and needed to be close to a bathroom, plaintiff  was able in most weeks to work forty hours.  By November 2008, she had no restrictions from her doctor related to this condition and by March 2009, her bowel problems were completely resolved.  Plaintiff testified that her bowel condition did not impair her ability to work at other jobs she held after her termination in October 2008.

### Plaintiff's taking schedule deviations approved by her supervisor in 2008

In February 2008, plaintiff's supervisor, Tommy Johnson, began allowing plaintiff to modify her work schedule because of her medical issues with her shoulder and bowel.  Johnson testified that he allowed plaintiff to modify her schedule, out of empathy for her medical condition, but also because he needed plaintiff on staff; his department was understaffed at that point.  Thus, he allowed plaintiff take absences of hours or days in duration.   Plaintiff had presented to defendant her doctor's note stating that she could work forty hour weeks, but would need scheduling modifications to accommodate her medical problems.   If plaintiff did not make up the missed time in the same work week, Johnson assessed plaintiff an attendance point.  But if plaintiff made up the missed time within the same work week, Johnson did not assess any attendance points.

14

Johnson discovered, when he received refresher training on September 16, 2008, that his practice of allowing plaintiff such schedule deviations was not in compliance with defendant's Schedule Deviation Policy, and that he was not authorized to grant the schedule deviations he had been granting to plaintiff. Johnson had allowed plaintiff to take schedule modifications for more than four hours in a given day; he had not required plaintiff to request such modification at least one day in advance; and he had allowed plaintiff to take such leave for medical reasons beyond attending a doctor's appointment. To plaintiff's knowledge, no other employee during plaintiff's tenure was allowed to take such schedule deviations without accruing attendance points.

Johnson determined that he would not assess plaintiff points retroactively for work weeks preceding the week of September 14, 2008. And after the week of September 14, Johnson granted no further schedule deviations that were not in compliance with defendant's Schedule Deviation Policy. But during the week of September 14, Johnson did assess an attendance point. On the day Johnson was taking the training course, plaintiff was absent; Johnson had approved plaintiff's request for a schedule deviation such that she could be absent on Monday, September 15 and Tuesday, September 16. Plaintiff worked on September 17, 18 and 19. Consistent with Johnson's prior approval of her schedule deviation request, plaintiff worked four extra hours on Friday September 19, and 12 hours on Saturday September 20, making up for the 16 hours she had missed on September 15 and 16 of that work week. Nonetheless, Johnson assessed plaintiff an attendance point for September 15.

Plaintiff worked full shift days on September 22 and 23. On Tuesday, September 23, the day that HR reviewed the attendance records and determined if progressive discipline was in

order, Johnson presented plaintiff with a Notice of Verbal Warning based on the attendance

point he had assessed for her absence on September 15.  During this meeting, Johnson presented

to plaintiff a comprehensive attendance report detailing her entire attendance record and accrual

of attendance points.  But, whether Johnson informed plaintiff that he would no longer approve

shift deviations under the parameters he had before, is a disputed fact.  Plaintiff asked Johnson if

she could have a personal leave of absence without pay through October 7, 2008;[40]  Johnson

declined this request.

### *Plaintiff's termination*

Plaintiff was absent again on September 25 and 26, 2008.  For both of these absences,

plaintiff gave about an hour's notice that she would be absent because of her medical problems.

Johnson did not approve a schedule deviation, and Johnson assessed another attendance point for

these absences.  Plaintiff was again absent on September 29.  On October 1, Johnson and a

representative from HR met with plaintiff, presenting her with a Notice of Written Review for

passing the five point threshold.  Plaintiff again asked for a leave of absence through October 7

and her request was declined.   Plaintiff was absent October 2.  Plaintiff came to work on

October 3, but left after about two hours, when Johnson declined her request to make up her

absences on September 29 and October 2 with schedule deviations.  Johnson told plaintiff she

would be assessed an attendance point for her absence on October 2; plaintiff thus accrued

another attendance point, bringing her total to 6.25 points, and she received a  Notice of Final

Warning.  This was plaintiff's third Notice of Final Warning in a twelve month period.  On

Tuesday October 7, 2008, HR reviewed the attendance records, and determined that plaintiff had

---

[40]The Court previously determined the testimony cited by defendant does not render plaintiff's affidavit a sham.

received three Notices of Final Warning. Plaintiff was terminated on October 7, 2008, one day before her previously approved FMLA was to commence.

### *Defendant's application of third Notice of Final Warning to other employees*

Before May 2008, although its Attendance Policy stated that defendant "may" terminate an employee for receiving three Notices of Final Warning within a twelve month period, defendant had not terminated any employee on that basis. In May 2008, defendant learned that employee Brandon Large had a pattern of receiving three Notices of Final Warning, but falling short of accumulating the seven attendance points that had theretofore resulted in automatic termination. Consequently, defendant decided to start enforcing as mandatory the language in its Attendance Policy that allowed for termination upon the issuance of three Notices of Final Warning within a twelve month period. Defendant did not immediately terminate Large; it terminated him in May 2008, after he received his fourth Notice of Final Warning. Plaintiff was the first employee to be terminated upon receipt of a third Notice of Final Warning. After plaintiff's termination, in December 2008, employee Jack Santos was terminated upon receipt of his fourth Notice of Final Warning. Defendant claims to not have discovered that Santos had received three such notices until he received the fourth. In 2009, defendant terminated four employees upon their receipt of three Notices of Final Warning. These terminations all occurred after plaintiff had commenced her EEOC complaint against defendant.

## V.    Discussion

### A.    FMLA

The FMLA entitles a qualified employee up to twelve weeks of leave during any twelve month period "[b]ecause of a serious health condition that makes the employee unable to

perform the functions of the position of such employee."[41]  In addition to the leave, an eligible

employee is entitled to be restored to the same or an equivalent position upon return from

leave.[42]          Plaintiff asserts her FMLA claims under two theories: (1) interference under §

2615(a)(1) of the FMLA, and (2) retaliation under § 2615(a)(2) of the FMLA.[43]  The Court

discusses each in turn.

### 1.       Interference

Under the interference theory, plaintiff has the burden to show entitlement to FMLA

leave, but need not show the employer's intent to interfere with FMLA leave.[44]  Under this

theory, if an employer interferes with an employee's FMLA-created right to a medical leave, it

has violated the FMLA, regardless of its intent.  But, "[a] reason for dismissal that is unrelated to

a request for an FMLA leave will not support recovery under an interference theory."[45]

A prima facie case of interference thus requires a showing that: (1) plaintiff was entitled

to FMLA leave; (2) that an adverse action by the employer interfered with plaintiff's right to

take FMLA leave; and (3) that the employer's adverse action was related to the exercise or

attempted exercise of plaintiff's FMLA rights.[46]  Here, it is undisputed that effective October 8,

2008, plaintiff was entitled to FMLA leave; indeed, defendant had approved FMLA for

---

[41]29 U.S.C. § 2612(a)(1)(D).

[42]*Id.*; § 2614(a)(1)(A)-(B).

[43]29 U.S.C. § 2615 *et seq.*

[44]*Id.*;  § 2612(a)(1)(D).

[45]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 877–78 (10th Cir. 2004) (citing *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 298, 961 (10th Cir. 2002); *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1262 (10th Cir. 1998)).

[46]*Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1180 (10th Cir. 2006).

plaintiff's surgery and post-surgery recovery.  But, plaintiff was terminated on October 7, 2008, the day before her FMLA leave was to commence, thus interfering with her exercise or attempted exercise of her FMLA rights.

What is disputed in this action is whether defendant's termination of plaintiff was related to her exercise or attempted exercise of her FMLA rights.  Defendant contends that it had a legitimate reason to terminate plaintiff on October 7, for she had accumulated three Notices of Final Warning, grounds for termination under defendant's Attendance Policy.  When an employee requests and can demonstrate an entitlement to FMLA leave, she has no greater rights than the employee who continues to report to work.[47]  Thus, an employee may be terminated, even where the termination interferes with her ability to take FMLA leave, so long as she would have been terminated regardless of her leave request.[48]   It is the employer's burden to demonstrate that the employee would have been terminated irrespective of her request for, or taking of FMLA leave.[49]

Although defendant offers evidence that plaintiff had accumulated three Notices of Final Warning by October 7, subjecting her to termination under its Attendance Policy, there are material issues of fact as to whether plaintiff would have been terminated irrespective of her request for, or taking of, FMLA leave.  To be sure, the language of the Attendance Policy allowed for termination when the employee received three Notices of Final Warning within a

---

[47]*See Gunnell*, 152 F.3d at 1262.

[48]*Id.*

[49]*See Metzler*, 464 F.3d at 1180 (citation omitted); *see also* 29 C.F.R. § 825.216(a) ("An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment.").

twelve month period.  The Operations Attendance Policy stated that  "[t]hree written warnings within a 12 month period may constitute grounds for termination"; and when the attendance policies for operations and call center associates were merged effective April 18, 2008, the Non-Exempt Attendance Policy stated that "[t]hree written warnings within a 12 month period may also constitute grounds for termination."  To be sure, prior to 2008, defendant had consistently granted plaintiff's request for FMLA leave when appropriate and when she was eligible.  Nonetheless, issues of fact preclude a determination that plaintiff would have been terminated under this discretionary provision, irrespective of her request for FMLA leave.

First, it is undisputed that prior to 2008, no employee had been terminated for receiving three Notices of Final Warning within a twelve month period, unless that employee also had accumulated at least seven points under the Attendance Policy.  Defendant claims that prior to October 7, 2008, it had decided to enforce this discretionary language and mandate termination of anyone receiving three such warnings within a twelve month period, irrespective of the employee's accrued points.  Defendant explains that its decision to enforce this provision as mandatory was due to a perceived abuse of the attendance policy by another employee, Brandon Large, whom defendant terminated in May, 2008.  But the undisputed evidence was that at the time of termination, Large had received four written warnings within twelve months.  Despite its change in enforcement of the policy, defendant did not immediately terminate Large at the time defendant was aware that Large had three written warnings.  Rather, defendant waited until Large had received another written warning, his fourth within twelve months, to terminate him in May 2008.

Plaintiff was terminated in October 2008, upon receipt of her third Notice of Final

Warning.  In contrast, Jack Santos was terminated in December 2008, but only after receiving his fourth written warning.  Defendant explained that its HR department mistakenly overlooked Santos's third warning and did not terminate him until they realized he had four written warnings within a twelve month period.  This chain of events raises a genuine and material issue as to whether defendant would have terminated plaintiff under defendant's so-called mandatory three written warning policy, irrespective of plaintiff's request for FMLA leave, which was to commence the day after termination.  Although defendant proceeded to terminate other employees in 2009 upon their receipt of three, rather than four, written warnings, the fact that, except for plaintiff,  defendant did not actually enforce its alleged change of policy in this manner until after plaintiff's EEOC complaint was filed, demonstrates that there remains a factual issue surrounding defendant's interference with plaintiff's FMLA rights.

Moreover, plaintiff's supervisor's practice of allowing plaintiff schedule deviations until he learned he was in violation of defendant's Schedule Deviation Policy, raises issues germane to whether there was a causal connection between her termination and her attempted exercise of FMLA leave.  It also raises issues germane to whether defendant's stated reason for terminating plaintiff was pretextual, as discussed in the following section on plaintiff's claim of retaliation under the FMLA.  Beginning in February 2008, Tommy Johnson allowed plaintiff to be absent for full or partial days as needed, and make up the time by working longer shifts during the work week, and/or working on Saturday.  For those weeks that plaintiff made up the missed hours and worked a total of forty hours, Johnson did not assess an attendance point against her; but for those weeks that plaintiff was unable to make up the missed time, Johnson did assess an attendance point against her.  Johnson allowed her to deviate from her work schedule in this

manner, on the premise that plaintiff's doctor's note had stated that while she could work forty hour weeks, she needed accommodation or flexibility to modify her work hours as needed. Johnson was motivated not only by empathy for plaintiff, but because he needed plaintiff's labor, as his department was understaffed.

This practice came to a halt in September 2008, after Johnson attended a refresher training course about defendant's attendance policy. In the training course, and through a discussion afterward with the trainer that day, Johnson learned that his practice of allowing plaintiff to deviate from her scheduled work hours was in violation of defendant's Schedule Deviation Policy. That policy allowed for deviations only when certain conditions were met: (1) the modification was for no more than four hours in a workday; (2) the associate had requested the modification at least one day in advance; (3) the associate made up all the missed time in the same work week; and (4) the modification was for the associate to attend a medical, dental or court appointment. Unless all four conditions were met, Johnson learned, he had no authority to grant the schedule deviation request. Because Johnson had allowed plaintiff to modify her schedule for more than four hours in a work day and because plaintiff had not always requested the modifications at least one day in advance, Johnson had been violating the policy. Moreover, at least some of the absences were not due to plaintiff having a medical appointment; rather, the absences were due to her medical condition, and consistent with her doctor's note that she would periodically need to be accommodated with modifications to her schedule.

On September 16, 2008, armed with the realization that he had been allowing plaintiff unauthorized schedule deviations since February, Johnson did not assess points against plaintiff for days prior to September 15 in which he had granted deviations in violation of the policy. But

for that particular work week, September 14-20, Johnson did assess an attendance point for plaintiff's absence on September 15. Prior to the training session on September 16, Johnson had granted plaintiff's request for a schedule deviation for her absences on September 15 and 16. Both of these absences were due to her ongoing medical problems with her shoulder and/or bowel; and for both absences, plaintiff gave only about an hour prior notice. Neither absence was thus a permissible schedule deviation under the terms of defendant's policy, but Johnson had already granted these deviations. Plaintiff made up the sixteen hours by working four extra hours on Friday September 19 and twelve hours on Saturday, September 20. Nonetheless, Johnson assessed plaintiff an attendance point for September 15.

There remains an issue of fact concerning the propriety of defendant assessing this attendance point for September 15. Plaintiff has not raised the propriety of assessing the point on September 15 as germane to any issue of whether plaintiff was properly terminated. Plaintiff was not directly terminated because of the number of points. Nonetheless, the number of points affected the type of progressive discipline she received. On September 23, plaintiff received a Notice of Verbal Warning; after her absence on September 25, she received a Notice of Written Warning; and after her absence on October 2, she received a third Final Notice of Warning that resulted in her termination. Thus, this issue concerning the assessment of the point on September 15 is germane to the issue of whether there was a causal connection between plaintiff's attempted exercise of her FMLA rights and her termination. Indeed, all of the facts and circumstances leading up to her termination, including her absences, the assessment of attendance points and the attendant progressive discipline is germane to this element of plaintiff's prima facie case.

Other factual issues surround the element of causal connection. During the counseling session on September 23, plaintiff claims that she requested an unpaid leave of absence through October 7. Plaintiff also claims that she requested a personal leave of absence through October 7, when Johnson and a representative of HR gave her the Notice of Written Warning on October 3. Whether plaintiff asked for these leave of absences is controverted, but a fact issue germane to whether there was a causal connection between plaintiff's attempted exercise of FMLA leave and her termination the day before it was to commence. These requests for leave through October 7 may have appropriately been declined under the terms of defendant's policy, yet a reasonable fact finder could also rely upon this as still more evidence of a causal connection between plaintiff's attempted exercise of her FMLA rights and her termination, as well as evidence that defendant's stated reason for terminating her was a pretext for discrimination. Accordingly, summary judgment is denied on plaintiff's claim of interference with FMLA rights.

### 2. Retaliation

Plaintiff also claims that defendant retaliated against her for her attempted exercise of FMLA rights when it terminated her on October 7, the day before her FMLA leave was to commence. Retaliation claims under the FMLA are subject to the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*.[50] Under this analysis, the plaintiff bears the initial burden of establishing a prima facie case of retaliation.[51] If the plaintiff does so, then the defendant must offer a legitimate, non-retaliatory reason for the employment action.[52] The plaintiff then bears

---

[50]*Metzler*, 464 F.3d at 1170 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)).

[51]*Id.*

[52]*Id.*

the ultimate burden of demonstrating that the defendant's proffered reason is pretextual.[53]

To state a prima facie case of retaliation, plaintiff must show that: (1) she engaged in a protected activity; (2) defendant took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action.[54]  Defendant does not dispute that plaintiff's request for FMLA forms constituted protected activity or that termination is an adverse employment action.  Rather, defendant contends that plaintiff has failed its burden of establishing a causal connection between her attempted exercise of FMLA rights and her termination, and thus has failed to state a prima facie case of retaliation.

To establish the third element of a prima facie case of retaliation, plaintiff must show a causal connection between her protected activity of taking FMLA leave and defendant's decision to terminate her employment.[55]  The "critical inquiry" at this prima facie stage is "whether the plaintiff has demonstrated that the [employer's] action occurred under circumstances which give rise to an inference of unlawful discrimination."[56]  The Tenth Circuit has long-recognized temporal proximity between protected conduct and termination as relevant evidence of a causal connection sufficient to "justify an inference of retaliatory motive."[57]  Plaintiff may demonstrate a causal connection between the protected activity and her termination "by evidence of

---

[53]*Id.*; *see also Gunnell v. Utah State Coll.*, 152 F.3d 1253, 1263 (10th Cir. 1998) (explaining that plaintiff has the ultimate burden of demonstrating that the challenged employment decision was the result of intentional retaliation).

[54]*Metzler*, 464 F.3d at 1171 (citation omitted).

[55]*Id.*

[56]*Id.* (citing *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002) (quotations omitted)).

[57]*Id.* (citing *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1228 (10th Cir. 2006)).

circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."[58]

> We have held that "unless the [adverse action] is very closely connected in time to the protected activity, the plaintiff must rely on additional evidence beyond mere temporal proximity to establish causation." A six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation, but a three-month period, standing alone, is insufficient.[59]

The court has also emphasized, however, that a plaintiff may rely on temporal proximity alone only if "the termination is *very closely* connected in time to the protected activity."[60] Here, the temporal proximity is strong; defendant terminated plaintiff the day before her FMLA leave was to commence.

Even if this strong temporal showing were insufficient to show a causal connection, plaintiff offers other facts demonstrating that her termination occurred under circumstances that give rise to an inference of unlawful discrimination. As the Court explained in its discussion of plaintiff's interference claim, there are facts, or issues of fact, surrounding the assessment of an attendance point against plaintiff for the week of September 14, and the resulting verbal warning she received, and there are facts, or issues of fact surrounding plaintiff's termination for three Final Notices of Warning, when Brandon Large and Jack Santos were not terminated until they received four such written warnings. These facts and issues of fact, if decided in plaintiff's

---

[58]*Mondaine v. Am. Drug Stores, Inc.*, 408 F. Supp. 2d 1169, 1191 (D. Kan. 2006) (quoting *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir. 1982)).

[59]*Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004) (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (emphasis in original)); *see also Metzler*, 464 F.3d at 1171–72.

[60]*Id.* (quoting *Anderson v. Coors Brewing*, 181 F.3d 1171, 1179 (10th Cir. 1999) (emphasis in original)).

favor, could reasonably give rise to an inference that defendant discriminated against plaintiff when it terminated her.

Plaintiff having stated a prima facie case of retaliation, the burden shifts to defendant to state a legitimate, non-retaliatory reason for terminating plaintiff. This defendant accomplishes, with evidence that it decided in May 2008 to enforce the discretionary language of its Attendance Policy and mandatorily terminate an employee who received three written warnings in a twelve month period, irrespective of the accumulated number of points.

But, plaintiff points to sufficient facts or issues of fact that show that defendant's proffered reason was a pretext for discrimination. To raise a fact issue of pretext, plaintiff must present evidence of temporal proximity plus circumstantial evidence of retaliatory motive.[61] A plaintiff typically makes a showing of pretext in one of three ways: (1) evidence that defendant's stated reason for the adverse employment action was false, *i.e.* unworthy of belief; (2) evidence that defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting plaintiff.[62] A plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[63]

---

[61]*Id.* (citing *Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1206-07 (10th Cir. 2000)).

[62]*Kendrick v. Penske Transp. Servs, Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).

[63]*Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted).

While this burden is not onerous . . . it is also not empty or perfunctory."[64]   In this case, a reasonable factfinder could find inconsistent and contradictory defendant's explanation that in May 2008 it decided to mandatorily terminate employees who had received three written warnings, because defendant did not terminate Brandon Large in May, nor Jack Santos in December until they each had received four warnings.  And by the time defendant began actually terminating employees with three written warnings, plaintiff had initiated her EEOC complaint in 2009.  Pretext can be established with evidence that a policy was arbitrarily and selectively enforced.

Pretext can also be shown by proving that similarly situated non-protected individuals were treated more favorably for committing comparable conduct.[65]  "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline."[66]  Defendant seemingly argues that plaintiff, Brandon Large and Jack Santos were not similarly situated; pointing out that Santos had a different supervisor.  Yet, with respect to the three written warnings policy, enforcement occurred not at the supervisor level, but through defendant's HR department.  And, defendant's argument that the HR generalist who handled Santos' file was not the same HR person who handled plaintiff's file is unpersuasive.  The HR department was one unit, and as a unit monitored the weekly attendance reports precisely so that defendant could the required corrective action under its Attendance Policy.

---

[64]*Id.* at 1323-24.

[65]*Kendrick* , 220 F.3d at 1232.

[66]*Rivera v. City & County of Denver*, 365 F.3d 912, 922–23 (10th Cir. 2004) (quoting *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997) (internal quotation marks omitted)).

In October 2008, plaintiff was terminated for three written warnings, yet after the change to mandatory termination, two employees were not terminated until they had received four written warnings. Moreover, as the Court discussed above, the assessment of an attendance point against plaintiff during the week of September 14 could raise an inference of discrimination, as well as an issue as to whether defendant's stated reason for terminating plaintiff was a pretext. Accordingly, summary judgment is also denied on plaintiff's claim of retaliation under the FMLA.

**B.      ADA**

The ADA prohibits employers from discriminating on the basis of disability. Where, as here, a plaintiff relies exclusively upon circumstantial evidence of discrimination, the Tenth Circuit had held that the analytical framework used in the familiar *McDonnell Douglas* case controls the analysis.[67] Thus, a plaintiff must first establish a prima facie case of discrimination.[68] Defendant argues that plaintiff cannot establish a prima facie case of discrimination under the ADA. The elements of a prima facie case of ADA discrimination are that plaintiff: (1) is a disabled person as defined by the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) her employer discriminated against her because of her disability.[69]

Defendant argues that plaintiff can neither prove that she is disabled within the meaning of the ADA, nor that she is qualified to perform the essential functions of the job, nor that she

---

[67] *Johnson v. Weld Cnty., Colo.*, 594 F.3d 12012, 1217 (10th Cir. 2010) (citing *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005)).

[68] *Id.*

[69] *Id.*

suffered discrimination.  Consistent with its analysis above, the Court finds that plaintiff points

to sufficient facts to raise a jury question as to whether defendant discriminated against plaintiff

on the basis of her medical conditions, an injured shoulder and a bowel condition.  Moreover,

there are sufficient undisputed facts to find that plaintiff was qualified to perform her job as an

RMI, with reasonable accommodation, that is, deviations in schedule that allowed her to take

absences, even while working a total of forty hours a week.  Indeed, until she was terminated,

the arrangement between plaintiff and Johnson largely worked.  Plaintiff had managed to work

forty hours in most work weeks, and had received only two written warnings in a twelve month

period, until she received the third written warning in October.

The ADA defines disability as "(A) a physical or mental impairment that substantially

limits one or more of the major life activities of such individual; (B) a record of such an

impairment; or (C) being regarded as having such an impairment."[70]  In this case, plaintiff pleads

an actual physical impairment, under section (A) above.  Plaintiff must precisely articulate her

impairment and the major life activity it substantially limits.[71]

Plaintiff claims that two impairments substantially limited one or more of her major life

activities.[72]  But plaintiff has failed to present facts or raise issues of fact that either her shoulder

injury or bowel condition or both substantially limited a major life activity.  First, she had an

---

[70]42 U.S.C. § 12102(1).

[71] *Johnson,* 594 F.3d at 1218 (citing *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003) (quoting *Poindexter v. Atchison, Topeka & Santa Fe Ry. Co.*, 163 F.3d 1228, 1232 (10th Cir. 1999)).

[72]Plaintiff originally asserted three impairments, but has apparently abandoned her assertion that her asthmatic bronchitis was disabling, as she did not mention this condition in her memorandum in response to defendant's motion for summary judgment. In fact, in her response brief, plaintiff states that she "has come forward with sufficient evidence to establish that she had two physical impairments which substantially limited two major life activities for more than one year." (Doc. 4 at 19.)

injury to her left rotator cuff, causing pain in her left shoulder, and necessitating surgery in October 2008. Prior to the surgery, and during the post-recovery stage, doctors had restricted her from lifting more than ten pounds during three periods, totaling about six months over a span of one year. Lifting has been recognized as a major life activity by the Tenth Circuit.[73] But plaintiff's shoulder injury was a temporary condition. Plaintiff had surgery to repair this injury on October 20, 2008, and four weeks post-surgery, plaintiff had no lifting or pulling restrictions of any kind. Her doctor fully released her and she had no further lifting restrictions. The restrictions she had over the six month period from November 2007 to November 2008, were short in duration, and were rendered unnecessary after her surgery. Moreover, the restriction limited plaintiff to lifting no more than ten pounds. This degree of restriction does not in and of itself evidence an impairment that substantially affects a major life activity.[74]

Plaintiff also claims that her bowel condition was an impairment that substantially limited the major life activity of controlling one's bowels. Plaintiff's condition included fecal incontinence or the frequent urge to have bowel movements. Yet plaintiff has failed to show that this condition was anything more than a temporary impairment. Plaintiff testified that from February 2008 to March 2009, the period in which she was plagued with this condition, the symptoms were not constant, but would intermittently "come and go." Although she needed to

---

[73] *See Lusk v. Ryder Integrated Logistics*, 238 F.3d 1237, 1240 (10th Cir. 2001) (citing *Lowe v. Angelo's Italian Foods, Inc.*, 87 F.3d 1170, 1172 (10th Cir. 1996)).

[74] *MacKenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1275 (10th Cir. 2005) (citing 29 C.F.R. § 1630.2(I)); *see also Rakity v. Dillon Cos., Inc.*, 302 F.3d 1152, 1158 (10th Cir. 2002) (finding medical records with forty pound lifting restrictions do not establish substantial limitation on life activity of lifting); *Sink v. Wal-Mart Stores, Inc.*, 147 F. Supp. 2d 1085, 1093 (D. Kan. 2001) (rejecting the argument that the inability to lift is a significant restriction in the ability to perform a major life activity) (citing *Reese v. Owens-Corning Fiberglas Corp.*, 31 F. Supp. 2d 908 917–18 (D. Kan. 1998) (collecting cases holding that lifting restriction, without more, is insufficient to demonstrate a substantial limitation on major life activity of lifting or working)).

have a parking space close to the building for some period of time and needed to be close to a bathroom, admittedly she was able in most weeks to work forty hours. By November 2008 she had no restrictions from her doctor related to this (or any other purported) condition;[75] and by March 2009 her bowel problems were completely resolved. In fact, plaintiff testified that her bowel condition did not impair her ability to work at other jobs she held after her termination in October 2008.

Moreover, plaintiff fails to show how her bowel condition affected a major life activity, much less substantially affected a major life activity. Plaintiff argues that controlling bowels is a major life activity, something that the Tenth Circuit has not recognized. Rather, problems with controlling body waste are sometimes claimed as substantially impairing the major life activity of working, rather than impairing the ability to control bowels.[76] Plaintiff cites to a Sixth Circuit case, *Workman v. Frito-Lay, Inc.,*[77] for the proposition that controlling bowels is a major life activity. Even if this were so, the facts of that case illustrate how plaintiff's complained of bowel condition did not have the substantial effect necessary for a finding of disability under the

---

[75]Plaintiff's reliance on *McKenzie v. Dovala*, 242 F.3d 967, 968, 973 (10th Cir. 2001) is not persuasive. Although the plaintiff's psychological impairment in that case had a duration of but four months, plaintiff was not relying upon a theory of an actual disability. Rather, plaintiff claimed that her employer regarded her as disabled and rejected her for re-employment because of her four month "record of disability." This is a separate and distinct basis for disability under the ADA and *McKenzie* does not stand for the proposition that a four month duration of impairment suffices to show a disability that, from a temporal respect, substantially limits a major life activity. Moreover, *McKenzie* is factually distinguishable, as that plaintiff had an onset of medical issues, and instances of disturbing and inappropriate behavior, at least a year before her termination, rendering her completely unable to work. In other words, the plaintiff in that case had impairments of a different nature and of a much greater severity than the plaintiff in the instant case.

[76]*See e.g.*, *Douglas v. Gen. Motors Corp.*, 982 F. Supp. 1448, 1449-1451 (D. Kan.1997) (court found that plaintiff's long term problems with Crohn's disease, an inflammatory bowel impairment, did not create a triable issue on substantial impairment of her ability to work).

[77]165 F.3d 460, 467 (6th Cir. 1999).

ADA.  In *Workman,* the plaintiff had been undergoing treatment for ten years for a significantly painful spastic colon, which was a lifelong condition, according to plaintiff's treating physician, who offered detailed information about her condition and resulting limitations.[78]  By contrast, in this case plaintiff's bowel condition was short-lived, apparently not painful, and demonstrably accommodated, at least for a while, by plaintiff's employer.  Accordingly, summary judgment is granted on plaintiff's claim under the ADA.

## VI.      Conclusion

There are material issues of fact surrounding the events leading up to defendant's termination of plaintiff that prevent judgment as a matter of law on her claims of interference and retaliation under the FMLA.  Although defendant contends that plaintiff was terminated because she received three notices of final warning under its Attendance Policy, there are material issues of fact as to whether she appropriately received the third final warning, for it was based on absences made up for with compensatory work time, consistent with the practices of plaintiff's supervisor.  Moreover, plaintiff was effectively the first employee to be terminated solely for three final warnings but fewer than seven attendance points, although defendant purported to have changed its policy a few months before terminating plaintiff.  All of these disputed issues of fact surrounding defendant's changes in practices and tightening of enforcement of its policies could lead a reasonable jury to find that defendant's termination of plaintiff was  related to her exercise or attempted exercise of FMLA rights, and thus interfered with her right to FMLA.  These factual issues could further lead a reasonable jury to find that there was a causal connection between plaintiff's attempted exercise of FMLA rights and her

---

[78]*Id.*

termination, and that defendant's articulated legitimate non-retaliatory business reason for terminating plaintiff was pretextual, and thus defendant retaliated against plaintiff for exercising her rights under the FMLA. Accordingly, summary judgment is denied on plaintiff's FMLA claims of interference and retaliation.

The Court further concludes that there are no material issues of fact surrounding the threshold issue of whether plaintiff was disabled within the meaning of the ADA. Although plaintiff had two physical impairments, an injured left rotator cuff and an intermittent problem with bowel and fecal incontinence, neither impairment substantially limited her in one or more major life activities. Accordingly, summary judgment is granted on plaintiff's ADA claim.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's Motion for Summary Judgment (Doc. 41) is GRANTED in part and DENIED in part.

**IT IS FURTHER ORDERED** that plaintiff's Motion for Leave to File Surreply (Doc. 50) is DENIED.

**IT IS SO ORDERED.**

**Dated:** June 22, 2011

 S/ Julie A. Robinson
**JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE**